ALFRED E. DEVENDORF and BARBARA L. DEVENDORF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Devendorf v. Commissioner
Docket No. 8573-76.
United States Tax Court
T.C. Memo 1981-680; 1981 Tax Ct. Memo LEXIS 59; 42 T.C.M. (CCH) 1753; T.C.M. (RIA) 81680; November 25, 1981. Ira B. Stechel and Joseph B. Pritti, for the petitioners. Lewis R. Mandel and Michael Shaff, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in petitioners' federal income tax as follows: Year
Deficiency
1970
$ 4,677.60
1971
51,074.00
The sole issue presented is whether petitioners are entitled to net operating loss carrybacks to the taxable years 1970 and 1971 as a result of a theft loss, within the meaning of *61 section 165(c)(3), [1] that was allegedly incurred in the taxable year 1973. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Alfred E. Devendorf ("Devendorf") and Barbara L. Devendorf, husband and wife, resided in Mill Neck, New York at the time they filed the petition in this case. During the period 1964 to 1969, Devendorf was employed by the Long Island Lighting Co. as a management trainee at an annual salary of aproximately $ 8,500. In 1970, Devendorf graduated from Brooklyn Law School. During the period 1970 to September 1973, he did not work. After being admitted to the New York Bar in the summer of 1973, Devendorf was employed as a mediator in neighborhood disputes by the Nassau County, New York District Attorney's office. This latter employment ended in 1976. Upon reaching his 35th birthday in March 1970, Devendorf was to receive the corpus of a trust fund that had been created by his father; the value of such corpus in early 1970 was in excess of *62 $ 400,000. Devendorf first met Paul G. Nathans ("Nathans") in 1950 when the two went to school together at the Choate School in Connecticut. From the time of their graduation in 1952 through the early 1970s the two men carried on a friendly and social relationship. Sometime in early 1970, shortly after Devendorf received the corpus of the trust fund set up by Devendorf's father, Nathans approached Devendorf seeking money. Beginning on May 27, 1970 and ending September 23, 1971, Devendorf made a series of 24 advances to Nathans. The total amount of such advances was $ 327,075. Also during this period, Nathans made eight payments back to Devendorf, totaling in all $ 70,588.85. After September 23, 1971, Devendorf made no further advances to Nathans. Nathans, however, continued to make payments back to Devendorf. From September 25, 1971 through October 4, 1972, Nathans made 15 separate payments totaling $ 57,900. At some point during this period, Nathans delivered to Devendorf various stock certificates as collateral for these advances. After liquidating this collateral during 1972 and 1973, Devendorf received an additional $ 6,296.17. In all, between 1970 and 1973, *63 Devendorf had advanced Nathans $ 327,075 and received in return money and property worth $ 134,785.02. In March or April, 1973, Nathans was arrested in Texas for conspiracy to smuggle half a ton of marijuana into the United States. In November, 1975, Nathans was convicted of the drug charge. In 1976 he was incarcerated at the federal prison in Danbury, Connecticut. Devendorf continued to keep in contact with Nathans during the latter's incaraceration and on one occasion, learning Nathans was ill, assisted Nathans in obtaining a transfer to a federal hospital in Lexington, Kentucky. On their 1970 tax returns, petitioners reported $ 3,900 as interest income received from Nathans. No interest income from Nathans was reported in 1971, 1972 or 1973. On their 1973 tax returns, petitioners claimed a casualty or theft loss of $ 192,190. This figure was calculated by subtracting the total value of money and property received from Nathans from 1970 through 1973 from the total amount of money advanced by Devendorf in 1970 and 1971 and subtracting the $ 100 statutory deductible amount. Thereafter, petitioners, after offsetting their joint 1973 income by a portion of such loss, timely *64 filed an application for tentative refund (Form 1045) and a claim for refund (Form 843) for their taxable years 1970 and 1971 to carry back to those years a net operating loss of $ 188,730. Respondent allowed the claims for refund for 1970 and 1971 and issued the petitioners refunds in the amounts of $ 4,677.60 and $ 51,074, for 1970 and 1971 respectively, plus statutory interest thereon. On audit respondent disallowed petitiioners' theft loss deduction for 1973 and asserted deficiencies against petitioners of $ 4,677.60 for 1970 and $ 51,074 for 1971. Devendorf instituted no civil action to attempt to recover from Nathans in 1973 or in any subsequent year. Additionally, he never caused a criminal complaint to be issued against Nathans for the latter's actions. Devendorf's efforts at recovering the remaining advances have been limited to keeping in touch with Nathans and continually asking for repayment. Since the time of Nathans' arrest in 1973, Devendorf has recovered no more than $ 1,000 from Nathans (a payment received in 1975). In 1975, prior to the time Nathans was to be incarcerated, but after respondent's disallowance of petitioners' deduction, Devendorf met with *65 Nathans. Devendorf presented Nathans with a 12-page document reciting a story of how Devendorf had been "swindled" by Nathans. Devendorf told the same story at the trial of this case. On September 9, 1975, Nathans returned this document to Devendorf with an affidavit attached to it. The affidavit, sworn to by Nathans before a notary public, stated "[T]he statement of facts concerning various transactins involving Alfred E. Devendorf and others and me are true as set forth in the attached statement." Nathans had been led to understand that this document would be used in the instant tax proceeding. At the time Nathans signed this affidavit, the statute of limitations on larceny had not expired under New York law. OPINION The sole issue for decision is whether petitioners incurred a deductible theft loss within the meaning of section 165(c)(3) in 1973. If we find that a theft loss occurred in 1973, under section 172(d)(4)(C) petitioners will be entitled to carry back a portion of that loss to their 1970 and 1971 taxable years, the years before the Court. See sec. 1.172-3(a)(3)(iii), Income Tax Regs. If, however, we conclude that the amounts at *66 issue here merely constituted net voluntary advances from Devendorf to Nathans, no loss arising therefrom in 1973 would produce a net operating loss which could be carried back into petitioners' 1970 and 1971 taxable years. See secs. 166(d) and 172(d)(2)(A). The burden of establishing both the existence and amount of a theft is on the taxpayer. Rule 142(a), Tax Court Rules of Practice and Procedure. At trial, Devendorf presented the following story to support his theft loss claim: Sometime in early 1970, shortly after Devendorf received the corpus of the trust fund set up by Devendorf's father, Nathans approached Devendorf seeking money. Nathans represented to Devendorf that certain estate taxes were owed on Nathans' father's estate, but the estate, worth nearly $ 1 million, was illiquid. Nathans sought to borrow $ 65,000 to pay these alleged taxes. Without checking into the truthfulness of Nathans' statements, Devendorf loaned Nathans the money. No formal written agreements were made as to how or when this money was to be paid back or what rate of interest, if any, Nathans was *67 to pay on the loan. However, Nathans delivered to Devendorf a 500,000-share certificate in Coast-to-Coast Co. to hold as collateral. Nathans told Devendorf that the stock was worth about 30 cents per share, but had previously been as high as $ 1 per share. In the fall or early winter of 1970, Nathans again approached Devendorf for money. Nathans told Devendorf about a newsstand Nathans had discovered near Church Street in Brooklyn, New York. Nathans said that the owner of the newsstand was interested in retiring and selling out the business. Nathans thought the newsstand would be a good investment opportunity and asked Devendorf to advance him funds to buy into this operation. Devendorf did not investigate the existence of this newsstand, nor did he seek to know whether Nathans' other statements in connectiong with it were accurate. Devendorf's only concern was that Nathans be in charge of managing the newsstand business personally. After receiving assurances from Nathans that Nathans would be an equal or managing partner in the newsstand business, Devendorf delivered a series of checks totaling $ 25,000 to Nathans to make the investment. No formal agreements were made *68 between the two men as to how profits or losses from the venture were to be allocated or how and when Devendorf was to be repaid his advance. Devendorf expected to be paid back his investment and to receive additional money out of profits generated by the business, but no documents to that effect were drawn up.
During the course of 1970, Devendorf loaned Nathans various other smaller sums on a short-term basis. Each of these short-term loans was paid back to Devendorf in full. In early 1971, Devendorf began asking Nathans for repayments of the outstanding larger loans. Nathans successfully put Devendorf off by saying that things were a little delayed with his father's estate. Nathans provided Devendorf with new assurances that the loans were secure: Nathans mentioned a piece of commercial property in Pennsylvania he owned worth in the neighborhood of $ 100,000, but tied up in partitioning problems. He also talked of giving Devendorf a 10 percent limited partnership interest in a commodity brokerage firm, Jay W. Kaufmann & Co., in which Nathans was a partner. Nathans stated that Jay Kaufmann, the other partner in the firm, owed him roughly $ 100,000. Finally, Nathans gave *69 Devendorf a sealed manila envelope which Nathans said contained additional collateral, but he asked that Devendorf not open the envelope at that time. Devendorf was mollified by all this talk and complied with Nathans' request not to open the envelope. In March or April, 1971, Nathans again approached Devendorf with an investment opportunity. Nathans told Devendorf that a clothing firm in Ohio named Bobbie Brooks wished to dispose of remnants of various clothing lines to a single purchaser. Nathans said the price of these remnants was very low and that by simply separating the remnants into smaller lots, they could be resold to retail clothing establishments at a smart profit with virtually no risk. With little or no investigation of Nathans' statements, Devendorf again gave Nathans the money he wanted (roughly $ 65,000). Devendorf expected to be repaid and repaid handsomely for his investment, but once again the exact terms for advancing the money to Nathans were not formally worked out. In the summer of 1971, Nathans for a fourth time approached Devendorf for a large sum of money. Nathans said he knew of a California company that had a large inventory of adult or girlie *70 magazines that was underpriced. Again, with little or no investigation, but primarily relying on Nathans' statements, Devendorf advanced Nathans about $ 75,000. Again, the exact terms of the loan or investment were not formally worked out. By September 23, 1971, Devendorf had advanced Nathans sums of money totaling in all $ 327,075. He had received back from Nathans only $ 70,588.85. During the following year Nathans continued to make frequent small payments in reduction of this "debt" to Devendorf while at the same time proposing new schemes and ventures for Devendorf to enter into. Devendorf, however, now short of cash, was cool to Nathans' further entreaties and instead began pressing Nathans for repayment of some of the monies advanced. Nathans continued to assure Devendorf that the various ventures were proceeding normally and profitably. The first indication to Devendorf that he might not be repaid occurred in March or April of 1973 when he received a phone call from Nathans' close friend and confident, Martin Snaric ("Snaric"). Snaric informed Devendorf that Nathans had been arrested in Texas for conspiracy to smuggle half of ton of marijuana into the United States. *71 Nathans was in jail and could not raise the $ 1,000 or $ 2,000 bail to get out. Snaric said he was unable to raise the money out of Nathans' remaining assets in New York and thought that Devendorf, as a friend of Nathans, might be willing to help raise bail. Devendorf declined to help, but was very disturbed by what he heard from Snaric concerning Nathans' monetary worth. At this point Devendorf contacted Nathans' lawyer, Nathans' accountants, Nathans' business partner and Nathans himself. He learned that Nathans was, in a word, broke. Nathans admitted to him that the various transactions had been "a collection of stories" and that there was no money left to pay Devendorf back. Most of what Nathans had told Devendorf over the past few years regarding the various enterprises was untrue. Nathans had not used the advances for the purposes intended, but rather had spent the money on himself in high living. The various items of collateral either were not as valuable as Nathans had represented, did not exist at all (e.g., Jay Kaufmann claimed he did not owe $ 100,000 to Nathans), or were never formally made collateral (e.g., Devendorf never did receive a 10 percent interest in *72 Jay W. Kaufmann & Co.) In summary, Devendorf testified that he was the victim of an elaborate swindle by Nathans. To corroborate this testimony, petitioners produced an affidavit signed by Nathans in 1975 admitting the truth of Devendorf's story. Petitioners produced no documentary evidence. They explain that there are no documents in this case because all the advances between Devendorf and Nathans were done on an informal, friendly basis. Thus, the petitioners' case appears to stand or fall on the credibility of Nathans' affidavit and Devendorf's testimony that intentional mis-representations produced the losses described herein. After weighing all the evidence in this case, and taking into account Devendorf's demeanor at trial we concluded that Devendorf's testimony and the statements contained in Nathans' "confession" are not credible for the following reasons: First, Devendorf portrays himself as a naive young man, unknowledgeable in the ways of the business world. This, he says, explains why he made no investigations of his friend's assertions and why he never asked for any papers to be drawn up. While it is true that even the naive are allowed theft loss deductions *73 under the Internal Revenue Code, Nichols v. Commissioner, 43 T.C. 842, 886 (1965), we do not believe Devendorf was as naive as he now claims to have been. Devendorf was a law school graduate in 1970. He presumably knew how to draw up legal documents and ask questions about what he heard when such large sums of money were involved. More importantly, Devendorf's behavior toward Nathans since 1973 has hardly been that of a man who was consistently lied to and cheated out of $ 200,000. It would only be human nature for Devendorf to want to sue Nathans civilly for recovery of the "stolen" funds or have a criminal complaint issued against Nathans. Devendorf worked for a district attorney's office from 1973 to 1976, so he certainly knew how to bring such actions. Yet he contends he turned the other cheek. He argues that it would have served no purpose to bring a criminal suit against Nathans because Nathans out of jail was more likely to earn money and repay him than Nathans in jail. Additionally, he argues, a civil suit in 1973 would have been useless since Nathans was penniless and judgment-proof at the time. We find such reasoning a bit inconsistent: If Devendorf *74 anticipated that Nathans might be able to earn money out of jail, presumably a civil judgment enforceable for 20 years, [2] would have some value in years subsequent to 1973. A more likely explanation for Devendorf's failing to prosecute civilly or criminally is that no theft actually occurred. [3]
Another factor which seems to belie Devendorf's testimony that Nathans swindled him repeatedly in 1970 and 1971 is the fact that the two men have done favors for each other well after Nathans' alleged theft was uncovered in 1973. Devendorf had stayed in touch with Nathans throughout the latter's incarceration on drug smuggling charges in 1976. On one occasion learning that Nathans was ill, Devendorf interceded on Nathans *75 behalf and got Nathans moved from federal prison in Danbury, Connecticut, to a hospital in Lexington, Kentucky. We find it not a little surprising that the alleged victim of a theft would be so solicitous as to the health of the swindler. Finally, in 1975 Nathans signed an affidavit entirely confessing the truthfulness of Devendorf's swindle story. The statute of limitations had not run on larceny at the time Nathans signed this paper. Devendorf did not choose to use this document to obtain a civil or criminal judgment against Nathans. Instead, Devendorf used the confession merely to assist in the proof of the instant case. Nathans was led to understand at the time he signed this confession that it was intended for use in Devendorf's dispute with the Internal Revenue Service. [4]
This continued friendship and willingness to do favors for each other seems hard to explain if Nathans actually *76 swindled Devendorf. It is certainly possible that victim and thief could remain friends after a $ 200,000 swindle, but we do not find it probable. In sum, we do not feel that Devendorf's story and Nathans' tax confession are credible. Accordingly, petitioners have failed in their burden of proving that any loss they might have sustained in 1973 was the product of theft. Respondent asserts that these advances were not the product of theft, but rather that they simply constituted nonbusiness loans. At trial petitioners were unclear as to whether they challenged this particular assertion of respondent. Petitioners' theft loss claim would, of course, not be inconsistent with the fact that the advances in question were originally intended as loans. However, petitioners made no effor to prove that Devendorf was in the business of making loans. Devendorf admitted that at least the advance of $ 65,000 to Nathans to help pay the estate taxes on his father's estate was a loan. Petitioners' 1970 income tax returns also show that they considered this particular advance a loan; they reported $ 3,900 of interest income received from Nathans in that year. In the absence of any documentation *77 to the contrary and in light of the evidence adduced by petitioners which actually supports part of respondent's determination, we hold the 1970 and 1971 advances to be nonbusiness loans. To the extent any of the advances were not intended as loans, they presumably represent intended investments in Nathans' various projects. In the case of taxpayers other than corporations, losses arising out of nonbusiness loans are treated as short-term capital losses. Sec. 166(d). Losses on investments likewise normally are treated as capital losses. Sec. 1211; cf. sec. 1244. We need not decide whether the loans or investments became worthless in 1973, and therefore whether any losses occurred in 1973, because in this case the existence of capital losses would not entitle petitioners to net operating loss carryback deductions in the years 1970 and 1971. Sec. 172(d)(2)(A). To reflect the foregoing, Decision *78 will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise specifically indicated.↩
2. N.Y. Civil Practice Law and Rules sec. 211(b) (McKinney 1972). ↩
3. We are by no means saying that failure to prosecute Nathans bars petitioners from taking a theft loss deduction; that is clearly not the law. See, e.g., Jones v. Commissioner, 24 T.C. 525↩ (1955). Such failure, however, does cast doubt on Devendorf's story when not adequately explained.
4. Devendorf's approach appears inconsistent. Having first built his case upon Nathans' duplicitousness, he now expects this Court to accept as true the statements in Nathans' affidavit. Nothing in the record convinces us that we should give the affidavit any credence whatever.↩